**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAOTERU TSURUTA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-CV-00425-SPM |
| | ) | |
| SARAH MARGARET TSURUTA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Petitioner Naoteru Tsuruta's Verified Complaint and Petition for Return of Child Under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), October 25, 1980, 1343 U.N.T.S. 22514, as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 9001 *et seq.* This Court has jurisdiction over the matter pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331. The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7). The Court has held an evidentiary hearing in this matter, and the parties have submitted post-hearing briefing. After consideration of the pleadings, testimony, exhibits, and briefing submitted by the parties, the Court will grant Petitioner's Complaint. The Court enters the findings of fact and conclusions of law below in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.    INTRODUCTION

"The Hague Convention 'was adopted in 1980 in response to the problem of international child abductions during domestic disputes.'" *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). "It is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in

1

the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (quoting Convention Preamble, Treaty Doc., at 7). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id.* (citing Art. 12, Treaty Doc., at 9). "The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence." *Id.*

"The principal objectives of the Convention are 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Barzilay v. Barzilay*, 536 F.3d 844, 846 (8th Cir. 2008) ("*Barzilay I*") (quoting Hague Convention Art. 1, T.I.A.S. No. 11670). "The Hague Convention is not designed to resolve underlying custody disputes, but rather to ensure that such disputes are adjudicated in the appropriate jurisdiction." *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (internal citations omitted). "Its 'primary purpose is to restore the status quo and deter parents from crossing international borders in search of a more sympathetic court.'" *Id.* (quoting *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 376 (8th Cir. 1995)).

## II.   PROCEDURAL BACKGROUND

Petitioner, a citizen of Japan and the father of minor child L.T., filed his Complaint on April 12, 2022. (Doc. 1). Petitioner alleged that on or around October 15, 2021, L.T.'s mother—Respondent Sarah Margaret Tsuruta, a United States citizen—wrongfully removed L.T. from Japan and has retained L.T. in Missouri since that date. Petitioner also alleged that L.T.'s place of habitual residence in October 2021 was in Japan, and that at that time Petitioner was exercising his custody rights under Japanese law. Petitioner requested that the Court enter an order returning L.T. to Japan. On May 2, 2022, Respondent filed an Answer, in which she denied the allegation that Japan was L.T.'s habitual residence. (Doc. 8, ¶ 21). She also asserted two affirmative defenses: (1) that relocating the child to

2

Japan would present a grave risk of physical or psychological harm to L.T. or would otherwise place L.T. in danger; and (2) that Petitioner consented and subsequently acquiesced to the Respondent's retaining L.T. in the United States. The Court held a scheduling conference pursuant to Rule 16 of the Federal Rules of Civil Procedure, and on May 24, 2022, the Court entered a Case Management Order setting deadlines for disclosure and discovery and setting the case for an evidentiary hearing. (Doc. 15).

On July 25, 2022, the parties submitted their pretrial briefs, witness lists, and exhibit lists. On August 1, 2022, the Court held a pretrial conference with counsel for the parties. On August 5, 2022, the parties appeared with counsel for the trial. Petitioner and Respondent testified, and Respondent presented an additional witness, Julia Hillyer. Following the trial the parties requested, and were granted, time to request a transcript of the hearing and file post-hearing briefs. The transcript was filed on August 15, 2022, and post-hearing briefing was completed on August 26, 2022. As such, the matter is now ready for a ruling.

### III.        FINDINGS OF FACT

The Court's findings of fact are based upon all credible evidence presented at trial, together with reasonable inferences derived from that evidence.

### A.  Credibility Findings

At the hearing, the Court heard testimony from Petitioner, Respondent, and Julia Hillyer, a licensed professional counselor. The Court also admitted Petitioner Exhibits 1-23 and Respondent Exhibits A-M into evidence.

Petitioner and Respondent gave divergent testimonies on a variety of topics including, among other things, the circumstances surrounding Petitioner's relocation from the United States to the United Kingdom, the circumstances surrounding their marriage in Japan, Respondent's role in Petitioner's business, whether Respondent understood that the family's move from the United

Kingdom to Japan in November 2018 was indefinite, and the nature of the relationship between Petitioner, Respondent, and their daughter, L.T. Neither Petitioner nor Respondent was an entirely credible witness. However, Petitioner's testimony was more credible on the most salient issues. In particular, Respondent's suggestion that she was held against her will in Japan and needed to "escape" was not credible when considered together with Respondent's own testimony about her life in Japan and other evidence presented at trial.

In making factual findings, to the extent the Court needed to resolve discrepancies between the parties' version of events, the Court has resolved those discrepancies in favor of the testimony most supported by other evidence of record.

The Court found Ms. Hillyer to be a credible witness. However, the Court gave her testimony little weight because it was based upon biased and/or incomplete information and had little or no probative value to the issues before the Court.

## B.  Factual Findings

Petitioner is a Japanese citizen who came to the United States to pursue an education. Respondent is a citizen of the United States who was born and raised in Missouri. In 2010, Respondent was living in Miami, Florida. Petitioner met Respondent in Miami, and they became friends. Their friendship evolved into a romantic relationship. In June 2011, they began living together in Scottsdale, Arizona, where Peittioner was operating a luxury skincare business. Respondent took a job working Petitioner's business in a variety of roles. In 2013, Petitioner moved to London, and Respondent moved back to Miami. Petitioner and Respondent's romantic relationship continued after Petitioner left for London, and in 2014, Respondent learned she was pregnant while visiting Petitioner in London.

On July 20, 2015, Respondent gave birth to L.T. in Miami, Florida, and listed Petitioner as the father on the birth certificate. When L.T. was ten months old, Respondent and L.T. moved to the

4

United Kingdom to live with Petitioner in London. From that point forward, until October 15, 2021, Petitioner, Respondent, and L.T. lived together as a family either in the United Kingdom or Japan. They visited Petitioner's family in Japan in early 2018. While there, on March 19, 2018, Petitioner and Respondent got married. Petitioner rented an apartment in Fujisawa in April 2018, but he later returned to the United Kingdom.

In November 2018, Respondent, Petitioner, and L.T. moved to Fujisawa, Japan. They lived in the apartment rented by Petitioner for about a year and then moved into a house sometime during 2020. Respondent, Petitioner, and L.T. lived as a family in Fujiswawa, Japan, until October 15, 2021. During that time, Respondent continued to work for Petitioner's skincare business (albeit in a more limited capacity). Otherwise, Respondent stayed home and, together with Petitioner, took care of L.T.

Respondent had misgivings about raising L.T. in Japan. In November 2019, Respondent and L.T. traveled to the United States to visit Respondent's family. Three months later, in February 2020, Respondent and L.T. voluntarily went back to Japan; Respondent testified that she did this because she loved her husband and wanted to work on things and do the right thing.

In the year leading up to October 2021, L.T. attended school/daycare in Fujisawa. The evidence further established that during her time in Japan, L.T. learned to speak both English and Japanese; engaged in extracurricular activities such as horseback riding, Kumon, and martial arts; attended family gatherings with Petitioner's family, including dinners and birthday parties; and went on vacations both in Japan and outside of Japan, including trips to the United States to visit Respondent's family.

Although she was not working outside of the home, Respondent appears to have been engaged with Petitioner's family and with activities of her own such as shopping and going to the gym. Respondent was alone with L.T. a fair amount of the time, as Petitioner's work often took him away on business trips. Throughout that time, Respondent's ability to communicate with friends and family

5

in Japan and the United States was not hampered in any way. She had access to, and frequently used, the internet, mobile phones, a laptop and other devices.

The evidence presented does not support a finding that Respondent's time in Japan was transient or other than indefinite. Respondent admitted that she held herself out as someone who was residing in a home that she considered hers, that she had a gym membership in Japan and went to the gym two or three times a week, that she went grocery shopping in Japan twice a week, that she visited and interacted with Petitioner's family, and that she had an OB/GYN in Japan she saw once a year.

Between November 2018 and October 15, 2021, Respondent and Petitioner experienced marital problems. Evidence presented demonstrated that, over time, Respondent became increasingly unhappy about a number of things, including the dynamics between her daughter, herself, her husband, and even the family dog. Petitioner appears to have been inconsiderate, insensitive and, at times, dismissive of Respondent's complaints. However, there was no evidence that Petitioner physically or sexually abused Respondent or physically or sexually abused L.T.

Throughout 2021, Respondent become increasingly anxious about returning to the United States. She repeatedly told Petitioner that she wanted a divorce and that she wanted to leave Japan and return to the United States. She urged Petitioner to renew L.T.'s expired U.S. passport. Petitioner expressed concern about Respondent and L.T. traveling given COVID restrictions. Evidence presented demonstrated that Petitioner attempted to conceal L.T.'s expired United States passport and Japanese passport from Respondent. Respondent, however, had possession of her own passport.

On October 15, 2021, Respondent spoke with her parents, who were in the United States. Her parents informed her that they had been in touch with their Congresswoman, Ann Wagner. Representative Wagner's office provided instructions for how Respondent might obtain an emergency passport for L.T. so that they could leave Japan. Following that conversation, Respondent went to the family's storage locker to search for L.T.'s U.S. passport after dropping L.T. at school. When she

found the passport, Respondent immediately reported to L.T.'s school, retrieved L.T., and took a taxi to the U.S. Embassy. Once at the Embassy, Respondent told the diplomat she met with that she feared for her life and for her child's safety. She obtained an emergency passport and was directed to go immediately to the airport. She and L.T. boarded an airplane bound for Hawaii and left Japan. L.T. and Respondent later made their way from Hawaii to St. Charles, Missouri, where they took up residence with Respondent's parents.

Petitioner was unaware of Respondent's plan to leave Japan on October 15, 2021. On the morning of October 15, 2021, Petitioner left home for a business meeting in Tokyo. Petitioner saw Respondent and L.T. when they left the house for L.T.'s school, however, Respondent did not tell Petitioner that she planned to leave for the United States that day. Although Respondent traded instant messages with Petitioner throughout the day, her messages all centered around Petitioner's meeting and other ordinary household matters. She never disclosed that she intended to leave for the United States with L.T.

When Petitioner returned home on the night of October 15th, he became alarmed and concerned that Respondent and L.T. had been kidnapped or harmed. He contacted authorities, who initiated a search for them. Petitioner subsequently learned that Respondent and L.T. had left for the United States. He learned that Respondent had a return flight for March 15, 2022, and based on his discussions with Respondent and members of her family, he initially believed that Respondent and L.T. planned to eventually return to Japan, as they had after prior trips to the United States.

On November 3, 2021, Respondent filed a Petition for Child Custody and Child Support in the St. Charles County Circuit Court. On November 10, 2021, Respondent filed a Petition for Dissolution of Marriage. In her discussions with Petitioner, Respondent suggested she would seek a divorce. However, Respondent had frequently threatened divorce in the past and, during her discussions with Petitioner in the Fall and Winter of 2021, Respondent also indicated she was

7

interested in reconciling with Petitioner. Petitioner expected Respondent to return to Japan with L.T. on March 15, 2022, the date of her return ticket, but wanted them to come back earlier. As such, Petitioner was caught off guard when he learned, in March of 2022, that Respondent had filed for divorce and that there was a hearing in the divorce case set for April. With assistance from the Japanese government, Petitioner obtained counsel and filed the instant action for return of his minor child.

## IV.    CONCLUSIONS OF LAW

As the parties acknowlege, the United States and Japan are both signatories to the Hague Convention.[1] The only issues in dispute in this case are (1) whether Petitioner has established a prima facie case for return of L.T. under the Hague Convenstion; and (2) whether Respondent has established an affirmative defense that would allow the Court to decline to order L.T.'s return even if Petitioner has established a prima facie case for return. Respondent has raised two affirmative defenses: (a) that relocating L.T. to Japan would present a grave risk of physical or psychological harm to L.T. or would otherwise place L.T. in danger; and (b) that Petitioner consented and subsequently acquiesced to the Respondent's retaining L.T. in the United States. As discussed below, it is not entirely clear whether Respondent is still taking the position that one or both of these affirmative defenses should apply, as she does not mention them in the proposed Memorandum Opinion she filed following trial. Nevertheless, the Court will address the affirmative defenses.

### A.  Prima Facie Case for Return

"To establish a prima facie case for return of the child under the Convention, the petitioner must show, by a preponderance of the evidence, that: (1) immediately prior to removal or retention, the child habitually resided in another Contracting State; (2) the removal or retention was in breach

---

[1] *See* https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited September 18, 2022).

8

of the petitioner's custody rights under that State's law; and (3) the petitioner was exercising those custody rights at the time of the removal or wrongful retention." *Custodio v. Samillan*, 842 F.3d 1084, 1088 (8th Cir. 2016). "If a petitioner establishes a prima facie case, the child must be 'promptly returned unless one of the narrow exceptions set forth in the Convention applies.'" *Id.* at 1089. (quoting 22 U.S.C. § 9001(a)(4)). The second and third elements of the prima facie case are not in dispute. *See* Respondent's Proposed Mem. Opin., Doc. 36, at 17 ("The parties do not dispute that Petitioner had rights of custody at the time Respondent returned to the United States, nor do they dispute that these rights were being exercised."). The only issue in dispute with respect to the prima facie case is whether Japan was L.T's habitual residence immediately prior to her removal from Japan in October 2021.

"The Hague Convention does not define the term 'habitual residence.'" *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020). Federal courts share a common understanding that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* The determination of a child's habitual residence is a "fact-driven inquiry" and "depends on the totality of the circumstances specific to the case." *Id.* at 723, 727. "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Id.* at 727. Facts relevant to acclimatization may include "a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings." *Id.* at 727 n.3 (internal quotation marks omitted). In addition to acclimatization, "the intentions and circumstances of caregiving parents are relevant considerations," especially for children too young to acclimate. *Id.* at 727. The Supreme Court has noted that, for example, if "an infant lived in a country only because a caregiving parent had been coerced into

remaining there," that circumstance "should figure in the calculus." *Id.* However, "[a]n actual agreement between the parents is not necessary to establish an infant's habitual residence." *Id.* at 723. "No single fact . . . is dispositive across all cases." *Id.* at 727.

The Eighth Circuit has identified several factors relevant to the determination of habitual residence: "the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country." *Barzilay v. Barzilay,* 600 F.3d 912, 918 (8th Cir. 2010) ("*Barzilay II*") (quotation marks omitted). *Accord Cohen v. Cohen*, 858 F.3d 1150, 1153 (8th Cir. 2017). "The 'settled purpose' of a family's move to a new country is a central element of the habitual residence inquiry." *Barzilay II,* 660 F.3d at 918. "This settled purpose need not be to stay in a new location forever, but the family must have a sufficient degree of continuity to be properly described as settled." *Cohen*, 858 F.3d at 1153 (quoting *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003)). Settled purpose is determined "from the child's perspective, although parental intent is also taken into account." *Id.* (quoting *Silverman*, 338 F.3d at 898). "That said, parental intent need not be completely clear, and 'one spouse harboring reluctance during a move does not eliminate the settled purpose from the [child's] perspective.'" *Cohen*, 858 F.3d at 1153 (quoting *Silverman*, 338 F.3d at 899; internal citation omitted).

After careful consideration of the evidence presented in light of the factors set forth above, the Court finds that Petitioner has demonstrated, by a preponderance of the evidence, that Japan was the habitual residence of L.T. immediately prior to her removal from Japan on October 15, 2021. First, there is significant evidence that L.T. acclimatized to Japan during her time there. There was a change in geography combined with the passage of an appreciable period of time—L.T. moved to Japan in November 2018 and continued to live there for almost three years before her removal, aside from a visit to the United States for a few months from November 2019 to February 2020. L.T. attended

10

daycare/school in Japan for over a year immediately prior to her removal. She also participated in sports and other extracurricular activities in Japan, including horseback riding, tennis, martial arts, and Kumon. She attended social gatherings in Japan, including dinners and parties with Petitioner's family. She went on trips and vacations in Japan with her parents and with Petitioner's family. She spoke both Japanese and English. Although L.T. maintained contact with her mother's family in the United States and visited them, the preponderance of the evidence supports a finding that, from L.T.'s perspective, "home" was in Japan, not in the United States or any other country. *See, e.g., Cohen*, 858 F.3d at 1154 (finding the United States to be a child's habitual residence and reasoning in part that he had lived there for almost two years, he attended school and speech-therapy classes there, he had friends and extended family there, and his mother had obtained employment, purchased a vehicle, and rented an apartment there); *Guzzo v. Hansen*, No. 4:22-CV-15 PLC, 2022 WL 3081159, at *5 (E.D. Mo. Aug. 3, 2022) (finding Spain was the habitual residence of a child despite evidence that the child regularly visited the United States, maintained significant family relationships in the United States, and had stronger English than Spanish skills; reasoning in part that the child had "lived in Spain for five years (or half of his life), spoke Spanish, and attended school, participated in extracurricular activities, socialized with friends, and had a pediatrician in Spain").

Second, although the evidence regarding the intentions of L.T.'s parents is conflicting, it generally supports a finding that the parents had the settled purpose of creating a home in Japan—perhaps not forever, but for a significant period of time. The Tsurutas have never lived together as a family in the United States. In contrast, the Tsurutas lived together in Japan for almost three years, where they lived in a rented apartment (and later in a house they purchased), placed their child in daycare/school and extracurricular activities, and pursued their own business and personal interests. *See Guzzo*, 2022 WL 3081159, at *5  (considering, among other factors, that "Mother and Father 'did what parents intent on making a new home for themselves and their child do—they [rented] a house,

11

pursued interests and employment, and arranged for [the child's] . . . schooling'") (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224-25 (3d Cir. 1995)). Petitioner's testimony and actions during the relevant time frame consistently indicate that his intent was for the family to live in Japan, at least for a significant period of time, for the purpose of his business. As to Respondent, despite her assertion that she intended their travels to Japan to be temporary visits, the bulk of the evidence suggests that she acted as if Japan was her home. She admitted that she held herself out as someone who was residing in a home that she considered hers, she had a gym membership in Japan and went two or three times a week, she went grocery shopping in Japan twice a week, she had an OB/GYN in Japan she saw once a year, and her visits to the United States were short compared to the long stretches of time she spent in Japan. Overall, the evidence supports a finding that the family was settled in Japan. *See Barzilay II*, 600 F.3d at 918 (noting that the settled purpose of a family's move "need not be to stay in a new location forever" in order to support a finding of habitual residence; finding the United States to be the habitual residence of the children despite evidence that it was that uncertain whether the parents intended to remain in the United States permanently).

The Court has considered Respondent's argument that Respondent and L.T. only remained in Japen due to coercion by Petitioner; however, the Court finds that argument unconvincing in light of the evidence presented. To support her claim of coercion, Respondent points to her financial dependence on Respondent, who she claims controlled all of the family's finances and determined what purchases she could make; her claim that Petitioner tricked her into signing a Japanese marriage certificate that would give him parental rights over L.T.; her claim that Petitioner confiscated L.T.'s passport so that Respondent could not return to the United States with L.T.; and her claim that Petitioner admitted to being motivated to "control and discipline" Respondent. Petitioner also cites two cases that she asserts involved circumstances similar to this case. First, she relies on *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045 (E.D. Wash. 2001), in which the court rejected the father's

argument that Greece was habitual residence of the children where the father had concealed information from his wife regarding his intent to move to Greece; the father had engaged in verbal abuse, physical abuse, and controlling behavior of the mother that was substantiated by photographs and/or testimony of witnesses outside the family; the mother had been primarily confined to the home in Greece by her obligations to the children and by the demands of her husband, who gave her a list of daily tasks, punished her physically if she did not do them, and demanded to know where she was at all times; the younger children were with their mother nearly all day, every day, in the new country, and (with the exception of the oldest child, who went to school) had little socialization with anyone outside the family; and the father controlled the family's finances. Second, she relies on *Ponath v. Ponath*, 829 F. Supp. 363 (D. Utah 1993), in which the court rejected the father's argument that Germany was the child's habitual residence where the family had traveled to Germany on a round-trip ticket to visit the petitioner's family, with a scheduled return trip a month later and an indication from the father that they would return within three months; the father had refused and prevented them from leaving by means of verbal, emotional, and physical abuse; the mother's clinical psychologist found respondent's behavior consistent with her having been verbally, emotionally, and physically abused; and the father had been arrested in the United States for allegedly attacking his sister-in-law in her home while attempting to see the mother and the minor child.

The Court finds these cases to be inapposite. The physical abuse, verbal abuse, and controlling behavior that motivated the courts in both *Tsarbopoulos* and *Ponath* are simply not present here. There is no evidence of physical abuse, violence, or threats of violence in this case. Additionally, having considered the testimony of Petitioner and Respondent and having reviewed the text message exchanges between the parties, the Court does not find evidence of the type of verbal abuse or controlling behavior that would suggest that Petitioner was coerced or forced into staying in Japan. Notably, when Respondent was asked about her allegations of verbal abuse, she described arguments

13

in which she participated, and she admitted that she would have considered her own statements to be verbal abuse as well. The text exchanges submitted in the parties' exhibits suggest a marriage with significant argument and friction, but not a relationship of abuse or control.

Although Respondent was somewhat socially isolated due to her lack of Japanese-language skills, there is no credible evidence that Petitioner tried to isolate Respondent or prevented Respondent from interacting with others. She had significant free time during the day, when L.T. was at daycare and Petitioner was at work; she freely moved around the city to shop and go to the gym and admitted that she could make calls or do whatever she wanted; and she frequently used mobile phones, a laptop, and other devices to communicate with friends and family in Japan and the United States. These facts sharply distinguish the instant case from *Tsarbopoulos*, in which the mother's movements and activities strictly monitored and controlled by her husband and the mother was largely confined to the home due to the combination of her childcare-related duties and the tasks given to her by her husband. The Court also notes that although there was evidence that Petitioner concealed L.T.'s passport from Respondent, Respondent always had her own passport.

Finally, Respondent's suggestion that Respondent's and L.T.'s presence in Japan was based on coercion and trickery is significantly undermined by the undisputed evidence that when Respondent did have the opportunity to take L.T. on a trip to the United States, she did not stay in the United States, but instead voluntarily returned to Japan. In November 2019, Respondent and L.T. traveled from Japan to Missouri, without Petitioner, and stayed with Respondent's family. If Respondent's presence in Japan had been due to Petitioner's coercion, the Court would have expected Respondent to take that opportunity to get away from Petitioner and from Japan. Instead, Respondent testified that she went back voluntarily in February 2020.

In sum, it appears that Respondent had mixed feelings about being in Japan and that she was, at times, reluctant to be there. But the facts presented do not amount to coercion, and they do not

14

significantly undermine the other evidence suggesting that Japan was L.T.'s home and thus her habitual residence. *See Cohen*, 858 F.3d at 1153 ("[O]ne spouse harboring reluctance during a move does not eliminate the settled purpose from the [child's] perspective.'") (quoting *Silverman*, 338 F.3d at 899; internal citation omitted); *Silverman*, 338 F.3d at 900 (finding that a mother's "post-move desire to return to the United States, and the finding by the district court that she was subject to coercion and abuse beginning two month after her arrival, does not change the legal conclusion that the habitual residence of the children changed from Minnesota to Israel").

The Court has also considered Respondent's argument that Petitioner is improperly "forum shopping" by filing the instant petition. Respondent notes that Petitioner filed the petition for return only after Respondent filed for divorce in Missouri and that Petitioner has had poor experiences with divorce litigation in the United States, including a history of warrants being issued for his arrest due to failure to pay child support. Respondent argues that Petitioner is using these proceedings as a forum selection mechanism in order to avoid divorce proceedings in the United States. Respondent relies on *Barzilay II*, in which the Court found that the children's habitual residence was in Missouri and that the father's attempt to return them to Israel, where he had a better chance of a favorable custody determination, was "precisely the sort of international forum shopping the Convention seeks to prevent." *Barzilay II*, 600 F.3d at 922. Respondent's argument and reliance on *Barzilay II* are misplaced. Here, unlike in *Barzilay II*, the Court has found that the relevant factors show that L.T.'s habitual residence was in Japan, not in the United States. Thus, Japan is the forum that should determine custody rights. It is Respondent, not Petitioner, who engaged in the sort of international forum shopping the Convention seeks to prevent when she took the child from her place of habitual residence to a different country and filed divorce proceedings there.

Based on the above, the Court finds that as of the time L.T. was removed from Japan, L.T.'s place of habitual residence was Japan. The burden thus shifts to Respondent to establish an affirmative

15

defense to L.T.'s prompt return.

## B. Affirmative Defenses

In her Answer, Respondent asserted two affirmative defenses: (1) that returning L.T. to Japan would expose L.T. to a grave risk of physical or psychological harm; and (2) that Petitioner consented to and acquiesced in Respondent's retaining L.T. in the United States. Neither defense is mentioned in the proposed findings of fact and conclusions of law submitted by Respondent, and it is unclear whether Respondent continues to take the position that either of the defenses apply. Nevertheless, the Court will address them below.

### 1. Grave Risk of Harm

Under Article 13b of the Hague Convention, a court "'is not bound to order the return of the child' if the court finds that the party opposing return has established that return would expose the child to a 'grave risk' of physical or psychological harm." *Golan v. Saada*, 142 S. Ct. 1880, 1891-92 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 10 (2010)). "ICARA requires that a respondent opposing return of a child under Article 13(b) must establish this exception by clear and convincing evidence." *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995). *See also* 22 U.S.C. § 9003(e)(2)(A). The Eighth Circuit has recognized "two types of grave risk that are cognizable under Article 13(b): (1) cases in which a child is sent to a zone of war, famine, or disease; and (2) those involving serious abuse or neglect." *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011) (citing *Silverman*, 338 F.3d at 900). Only the latter is potentially relevant in this case.

The grave risk exception must be "construed narrowly," and "[g]eneral evidence of harm is insufficient" to satisfy the exception. *Acosta v. Acosta,* 725 F.3d 868, 875 (8th Cir. 2013). "[I]n order to apply the Article 13(b) exception, the court would need to cite specific evidence of potential harm to the individual child[]." *Silverman*, 338 F.3d at 900. "[T]he potential harm must be severe, and there must be a probability that the harm will materialize." *Guzzo*, 2022 WL 3081159, at *7 (quoting *Ermini*

16

*v. Vittori*, 758 F.3d 153 (2d Cir. 2014) (internal quotation marks omitted)). *See also Babcock v Babcock*, 503 F. Supp. 3d 862, 882 (S.D. Iowa 2020) (noting that "the harm must be a great deal more than minimal" and that " [n]ot any harm will do nor may the level of risk of harm be low") (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)). A lack of evidence that past physical abuse of the child has occurred "does not necessarily render Article 13b inapplicable" where there is other evidence showing a significant risk of future abuse. *See Acosta*, 725 F.3d at 876 (affirming district court's finding of a grave risk of harm despite the absence of physical abuse of a child where the evidence showed that the father's inability to control his temper presented a significant danger that he would act irrationally toward himself and his children; noting the father's assault of a taxi driver in his children's presence, his abuse of the mother in the children's presence, his shoving of one of the children, and his telephonically expressed threats to kill his children and himself); *Walsh*, 221 F.3d at 220 (holding that the district court erred by discounting the grave risk of physical and psychological harm to the children where there was "a clear and long history of spousal abuse"; a history of "fights with and threats against persons other than [the father's] wife"; a history of "an uncontrollably violent temper"; a history of assaults that were "bloody and severe"; and "ample evidence that [the father] has been and can be extremely violent and . . . cannot control his temper").

In her Answer, Respondent alleged that Petitioner had "abused, isolated, controlled, and assaulted Respondent and the Minor Child, both physically and verbally," and that "[t]he Minor Child has expressed fear of Petitioner and is afraid of further harm at the hands of Petitioner." Respondent's Answer, Doc. 8, at ¶ 37. Respondent also alleged that she and the child were held in Japan against their will for twenty months, and that Petitioner "told Respondent that if she ever tried to leave Petitioner's control, he would kill her." *Id.* at ¶ 35. In her trial brief, Respondent argued that Petitioner's coercion and control over Respondent constituted spousal abuse beyond what a seven-year-old child should witness, that L.T. had indicated to Respondent that her father frequently got

physical with her, that Respondent had witnessed physical marks on the child stemming from the father getting physical on at least one occasion, and that Petitioner inappropriately bathed with his seven-year-old daughter.

When she testified at trial, Respondent offered no evidence in support of most of these allegations. She offered no evidence that Petitioner abused or assaulted L.T., no evidence that L.T. had expressed fear of Petitioner, no evidence related to bathing or improper sexual behavior, no evidence Petitioner ever threatened Respondent or L.T., no evidence that Petitioner had physically, sexually, or verbally abused L.T., and no evidence that L.T. was afraid of being harmed by her father. She also offered no evidence that Petitioner threatened to kill Respondent if she tried to leave his control, and no evidence that Petitioner ever physically abused Respondent. Respondent did testify that Petitioner verbally, mentally, and psychologically abused her. When asked to describe the abuse, Respondent testified that Petitioner would ask her every day what she was doing to better herself, that he was always cutting her down in front of her daughter, that he was disrespecting her and her daughter, and they would get in arguments. She testified that being around him made her skin crawl, that he made her feel like she had to ask him for everything, that he told her she could not speak English to her daughter, that they would leave her out in conversations during meals, and that he would tell their daughter untrue things and then their daughter would be mean to her.

The Court finds no evidence, let alone clear and convincing evidence, that returning L.T. to Japan would subject L.T. to a grave risk of physical or psychological harm. It appears that Petitioner and Respondent had significant marital problems and arguments, which L.T. may have at time witnessed. But there is no credible evidence that Petitioner has ever harmed L.T. in any way (physically or psychologically); that Petitioner has ever threatened to harm L.T. in any way; that Petitioner has a history of violence or abuse directed toward L.T., Respondent, or anyone else; or that Petitioner has any unstable or violent tendencies that might suggest a risk that he would harm L.T. in

18

the future. There is simply no evidence of past or potential harm to L.T. that might support a finding that returning L.T. to Japan would expose L.T. to a grave risk of physical or psychological harm. *Cf. In re Hague Application*, No. 4:07CV1125SNL, 2007 WL 4593502, at \*11 (E.D. Mo. Dec. 28, 2007) (grave risk of harm exception did not apply where there was "no credible evidence before the Court that Petitioner was abusive to or neglectful of the children" and "whatever alleged abuse Petitioner directed to the Respondent was not directed to the children.").

### 2. *Consent or Acquiescence*

Article 13a of the Hague Convention "provides a defense to an action for return if the petitioner 'consented to or subsequently acquiesced in the removal or retention' of the child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 n. 11 (6th Cir. 1996). "The Convention does not define consent or acquiescence in any more definite manner, and there is no statement to guide [courts] in the text or legislative history of the Act" *Id.* "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3rd Cir. 2005). The Sixth Circuit has held that "acquiescence under the Convention requires either: an act or a statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070 (footnotes omitted). Respondent bears the burden of establishing this defense by a preponderance of the evidence. *Leonard v. Lentz*, 297 F. Supp. 3d 874, 883 (N.D. Iowa 2017) (citing 22 U.S.C. § 9003(e)(2)).

In asserting this affirmative defense in her Answer, Respondent alleged that prior to leaving Japan, she informed Petitioner of her intent to come home to the United States, that Petitioner was aware at all times that Respondent had left Japan with the child for the United States and was in continuous contact with Respondent; and that Petitioner did not make any effort to secure the return

of the child until 180 days had passed after the removal and until over 150 days after Respondent filed divorce proceedings. Respondent's Answer, Doc. 8, at ¶¶ 41-44. Respondent did not address this defense in her trial brief or in the proposed memorandum opinion she filed after trial. However, the section of the proposed memorandum opinion addressing forum shopping does contain some argument that may be relevant to this defense: Respondent argues that "Petitioner appeared to have no problem with Respondent remaining in the United States with the child until he discovered she had filed for divorce. While Petitioner did frequently ask Respondent to come back to Japan, he did not seek to force her to return using judicial assistance for six (6) months. Meanwhile, Respondent repeatedly informed Petitioner that she had absolutely no intention of returning, yet Petitioner still did not seek judicial assistance. Then suddenly, after discovering that Respondent had filed for a divorce in the United States and several unmet demands from him for Respondent to dismiss the divorce proceedings, he filed his complaint herein." Respondent's Proposed Mem. Opin., Doc. 36, at 24.

Based on the evidence presented at trial, the Court finds that Respondent has not demonstrated, by a preponderance of the evidence, either that Petitioner consented to the removal of L.T. before it occurred or that Petitioner acquiesced in the removal after it occurred. With regard to the consent defense, the evidence presented shows that Petitioner was unaware of Respondent's plan to leave Japan with L.T., that Respondent never disclosed that she intended to leave Japan with L.T. before doing so, and that when Petitioner discovered that Respondent and L.T. were gone, he became alarmed and contacted the authorities. This evidence is completely inconsistent with the suggestion that Petitioner consented to Respondent's taking of L.T. from Japan to the United States. With regard to the acquiescence defense, Respondent offered no affirmative evidence of acquiescence, such as a written or oral renunciation of rights or a consistent attitude of acquiescence over a period of time. *See Friedrich*, 78 F.3d at 1070. Instead, the preponderance of the evidence supports a finding that

20

after the removal, Petitioner consistently wanted L.T. returned to Japan and communicated that desire to Respondent. Indeed, Respondent herself acknowledges that Petitioner frequently asked Respondent to return to Japan. Although it did take several months before Petitioner took legal action to secure L.T.'s return, the evidence suggests that for most of that time, Petitioner still believed that Respondent would return to Japan with L.T., as she had done after prior trips to the United States. None of Respondent's behavior shows that he acquiesced in L.T's remaining in the United States.

For all of the above reasons, the Court finds that Respondent has not established the affirmative defense of consent or acquiescce.

### V.   CONCLUSION

For the reasons stated above, the Court finds that Petitioner has established a prima facie case for return of L.T. to Japan and that Respondent has not proven that there is an affirmative defense preventing the return. Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Naoteru Tsuruta's Verified Complaint and Petition for Return of Child Under the Hague Convention (Doc. 1) is **GRANTED**.

**IT IS FURTHER ORDERED** that L.T. shall be returned to Japan, her country of habitual residence, at Respondent's expense at a reasonable date and time mutually agreed upon by the parties.

**IT IS FURTHER ORDERED** that Respondent shall make all necessary arrangements associated with returning L.T. to Japan.

**IT IS FURTHER ORDERED** that Respondent shall not, absent leave of this Court, remove L.T. from the Eastern District of Missouri pending her return to Japan.

**IT IS FURTHER ORDERED** that counsel for Mother shall file a notice with the Clerk of Court immediately upon L.T.'s arrival in Japan indicating that Mother has fully complied with the terms of this Order.

**IT IS FINALLY ORDERED** that no award of attorney fees or other costs, apart from the

aforementioned transportation costs associated with L.T.'s return, will be made at this time. The Court will consider any separate requests for attorney fees that Petitioner may file, upon motion properly made.

A separate judgment will accompany this Memorandum Opinion and Order.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of September, 2022.